**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| | § | SA-11-CR-516-XR |
| v. | § | |
| | § | |
| MEHRDAD ANSARI (3), | § | |
| | § | |
| *Defendant*. | § | |

**ORDER ON MOTION TO DISMISS INDICTMENT**

On this date, the Court considered Defendant's motion to dismiss his indictment for violation of the Sixth Amendment right to a speedy trial (docket no. 63) and the Government's response (docket no. 65). After careful consideration, Defendant's motion is denied.

**BACKGROUND**

**I.      The Alleged Conspiracy**

This case dates back over thirteen years—to 2007—when Defendant Mehrdad Ansari ("Defendant") allegedly conspired with Defendants Susan Yip ("Yip") and Mehrdad Foomanie ("Foomanie") to ship various goods to Iran in violation of the United States' prohibition on trade with Iran and various expert licensing requirements. *See* docket no. 3. The indictment alleges that the conspiracy was intended, in part, "to provide material support for the military and industrial manufacturing base and infrastructure of the country of Iran." *Id.* at 8. From at least 2007 to 2009, the conspirators allegedly obtained or attempted to obtain over 105,000 parts valued at $2.6 million. Docket no. 63-9 at 6. Yip, a Taiwanese citizen, acted as a broker through which Foomanie bought items in the United States and shipped them to Iran—diverted through either Taiwan or Hong Kong—using one of Yip's many companies. Docket no. 3 at 6.

Defendant, born in Iran but then living in the UAE, owned a freight-forwarding company in Dubai called Gulf Gate Sea Cargo, LLC. *Id.* The indictment lists seventeen items that the conspirators either shipped or attempted to ship, but Defendant is implicated in the shipment of only one of those items. *See id.* at 5–6 (items 10(a)–(q)). In 2008, the indictment alleges, Yip contacted a company in Cedar Park, Texas, seeking to purchase approximately $12,000 of microwave pyramidal absorbers that met military specifications. *Id.* at 10. Defendant purportedly assisted Yip and Foomanie with shipping those goods to Iran, including arranging the shipment and altering the bill of lading to show Taiwan as the destination. *Id.* at 11; docket no. 65-1 at 64, 67. The United States Department of Commerce's Office of Export Enforcement detected and held up that shipment. Docket no. 3 at 12. Thereafter, Defendant allegedly instructed Yip to lie to the Department of Commerce Special Agent by telling the agent the goods were intended for Taiwan, and that once the goods arrived in Taiwan, Yip should store them there "for a while" and later ship them to Iran. *Id.* The Department of Commerce substituted replacement goods to allow the shipment to proceed in furtherance of the Government's investigation. Docket no. 63-9 at 44. Aside from the microwave pyramidal absorber transaction, there is no indication that Defendant had further correspondence with either Yip or Foomanie. *Id.* at 36.

## II.   Efforts to Capture Defendant Ansari

Homeland Security Investigations ("HSI"), a unit of the Department of Homeland Security ("DHS"), opened its investigation on July 9, 2008. Docket no. 65-1 at 84. Initially, HSI entered "Mehrdad Ansari" into its TECS system, the case management program HSI used at the time to monitor international travel into and out of the United States. *Id.* at 80; docket no. 63-9 at 18. HSI obtained this biographical data from the signature block Defendant used in his email

communications with his co-conspirators. *Id.* From 2008 to 2011, Defendant was not the primary target in HSI's investigation; as described by HSI Case Agent Marcus Sexton at Defendant's detention hearing on March 31, 2020, Yip was the main focus of their investigation through that period. Docket no. 63-9 at 16.

All three defendants were indicted under seal on June 15, 2011, and an arrest warrant for Defendant was issued on that date. Docket no. 3; no. 65-1 at 98. HSI, however, claims that it had little information regarding Defendant: his "name, a couple phone numbers[,] and an email address." Docket no. 63-9 at 17. HSI decided not to contact Defendant, even after the indictment, because doing so would "likely jeopardize" the investigation by allowing Defendant and his co-conspirators to "do damage control, change their methods, change their operations." *Id.* at 14. HSI did, however, lure their primary target, Yip, to the United States under the ruse of a business deal. Docket no. 63-9 at 16. She was arrested on May 20, 2012 and thereafter pled guilty to Count One: Conspiracy to Violate the International Emergency Economic Powers Act and the Iranian Transaction Regulations. On October 24, 2012, this Court sentenced her to twenty-four months. *See United States v. Kip*, SA-11-CR-516(1)-XR. On that same day, the indictment was unsealed for all defendants.[1]

Defendant frequently traveled internationally during the relevant time periods. In July 2012, he applied for a B-1 Visa with the United States Department of State. Docket no. 63-2. In his visa application, he used his full passport name, Mehrdad Moeinansari. *Id.* at 1. In that same application, Defendant listed his Iranian citizenship, indicated he used no other names, and listed

---

[1] Foomanie remains a fugitive. Docket no. 63-9 at 10.

his employer as Gulf Gate Sea Cargo. *Id.* at 2–3.[2]  Because the TECS system listed <u>Mehrdad Ansari</u>
(pursuant to the electronic signature block use in Defendant's emails) but his full passport name
was <u>Mehrdad Moeinansari</u>, Defendant was not detected by the TECS system. *Id.* at 18. The
Department of State issued his visa, and in October 2012, Defendant traveled without incident to
and from the United States for a freight forwarders association conference. *Id.* Defendant traveled
to other countries in the ensuing years, including multiple visits to Germany, Spain, France, and
Turkey. *See* docket no. 63-3 at 1–5. Defendant maintains that his current passport, which is in the
Government's possession, will reveal future travel in more recent years. Docket no. 63 at 10, note
2. This travel was done with his passport which used his full name, Mehrdad Moeinansari. Docket
no. 63-3.

Despite Yip's arrest and sentencing—and Defendant's travel to and from the United States
the same month as Yip's sentencing—Defendant's whereabouts remained unknown to the
Government. Soon after unsealing the indictment, on October 31, 2012 DHS issued a "Fugitive
Report" for Mehrdad Ansari, and the Government argues that this report was accepted by the
National Crime Information Center ("NCIC"). Docket no. 65-1 at 86–87.[3]  When Internet searches
for Defendant—using the name Mehrdad Ansari—yielded little biographical data, HSI reached
out to its office in Dubai seeking further identifying information. The Dubai Police Criminal
Investigation Department identified Defendant, including his full passport name, Mehrdad

---

[2] The Government concedes that, at the time Defendant applied for his visa, it knew the name of Defendant's company, Gulf Gate Sea Cargo. Docket no. 63-9 at 19. That information, however, had not been entered into the NCIC database. *Id.* at 20.

[3] The exhibits show that HSI first filed a fugitive report which listed "Unknown" for Defendant's biographical information, but the Government explains that NCIC rejected this. Thereafter, HSI inputted estimates for those biographical characteristics, and the Government contends that NCIC accepted that report, though it provides no exhibit indicating NCIC's acceptance. *See* docket no. 65-1 at 85 (rejected fugitive report), 87 (accepted fugitive report), 86 (explaining the distinction).

Moeinansari. Docket no. 65-1 at 96. An updated Fugitive Report, now including Defendant's full name, was issued on July 16, 2013. *Id.* at 99.

Despite now—as of July 2013—knowing Defendant's full name, his likely location in Dubai, and the name of his company, the Government decided not to proactively seek Defendant's capture because of the known difficulties with extraditing Iranian fugitives, even if from friendly countries, and the likelihood that Defendant would "do damage control" if he became aware he was wanted. *See* docket no. 65 at 9; no. 63-9 at 14.   The Government also worried that if it contacted INTERPOL, the Iranian government would notify Defendant if a notice were issued because "the Iranian government was a co-conspirator." Docket no. 65 at 9.   Rather than seeking extradition or an INTERPOL notice, an agent with the Department of Commerce's Bureau of Industry Standards ("BIS") decided to place Defendant on the BIS Entities List, a list which imposes a license requirement on any U.S.-related business who seeks to do business with one of the listed entities, which were deemed "to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." *See* docket no. 65-1 at 110–13. Defendant's placement on the Entities List, the Government concedes, was a "laborious process," and it was not finalized until June 21, 2016. *Id.* In the meantime, the Government chose to wait and see if Defendant would otherwise return to the United States. Docket no. 63-9 at 51–52.

The Government had no success through the BIS Entities List. In May 2017, it turned to INTERPOL, first seeking to enter a "Red Notice" for Defendant. Docket no. 65-1 at 117.[4] An

---

[4] An INTERPOL Red Notice is published at the request of an INTERPOL member "to seek the location of a wanted person and his/her detention, arrest or restriction of movement for the purpose of extradition, surrender, or similar lawful action." Docket no. 65-1 at 115. They are sent to all INTERPOL members.

analyst with INTERPOL Washington explained that a Red Notice was unavailable because Iran was a "recalcitrant" country. *Id.* at 115.[5] That analyst explained two alternatives: publishing a Blue Notice or a Wanted Person Diffusion. *Id.* at 116. A Blue Notice is similar to a Red Notice except it does not commit the requesting country to extradite the subject. *Id.* at 123. The United States chose not to issue a Blue Notice because doing so sends notice to all countries, including Iran. A Wanted Person Diffusion, on the other hand, permits the requesting country to select a tailored group of trusted countries to which INTERPOL will send the request. *Id.* Similar to a Blue Notice, it does not require the same assurance that the requesting country will commit to extradite the located subject. *Id.*

On October 12, 2017, the Government submitted a Wanted Person Diffusion request to INTERPOL. Docket no. 65-1 at 124. INTERPOL entered that Wanted Person Diffusion, including both known names for Defendant, Mehrdad Ansari and Mehrdad Moeinansari. *Id.* at 3. Thereafter, the Diffusion was visible to all INTERPOL member countries except the UAE, Iran, Sudan, Syria, Russia, China, Pakistan, Afghanistan, and Lebanon.  *Id.* at 6. On June 14, 2019, authorities with INTERPOL Tbilisi in the Republic of Georgia informed INTERPOL Washington that Defendant had crossed the Georgian border. *Id.* at 18. Defendant was arrested on June 16, 2019. *Id.* at 20. Though Defendant contested his extradition, docket no. 63-9 at 8, the Supreme Court of the

---

[5] More specifically, INTERPOL will not issue a Red Notice for a recalcitrant country because INTERPOL cannot be assured that the United States will extradite the subject to the United States upon arrest. This is because any fugitive returning to the United States to stand trial must be granted a Significant Public Benefit Parole ("SPBP") to enter the United States. One factor in determining whether to grant that SPBP is the likelihood that the home country will accept the fugitive after the fugitive serves his or her sentence in the United States. There is concern, then, for the possible "failure of the United States to live up to its commitment to extradite the subject, if parole is not granted. This would result in the release of the subject, a loss of confidence in the United States as a law enforcement partner, and a reluctance to act on U.S. red notices in the future." Docket no. 65-1 at 115.

Republic of Georgia rejected his appeal, and the Minister of Justice granted extradition for all charges except charges 3 and 5, the money laundering counts, because there is no dual criminality with the Georgian money laundering statute. Docket no. 65-1 at 30. Defendant was surrendered to the U.S. Marshals on March 14, 2020, and a detention hearing was held on March 31.

## DISCUSSION

### I.    Applicable Law

To determine whether a defendant's right to a speedy trial has been denied so as to justify the dismissal of the indictment, a court must evaluate and balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's diligence in asserting his Sixth Amendment right, and (4) prejudice to the defendant resulting from the delay.  *Barker v. Wingo*, 407 U.S. 514, 530 (1972); *United States v. Serna-Villarreal*, 352 F.3d 225, 230 (5th Cir. 2003).

### II.    Application

In support of its motion, Defendant argues that the first three *Barker* factors weigh so strongly in his behavior that prejudice, the fourth factor, can be presumed. Docket no. 63. Considering the first factor, the length of delay, Defendant argues that delay—eight years, presumably from the time of Defendant's indictment in 2011 to his arrest in 2019—is "extraordinary" and "weighs heavily" in favor of Defendant. *Id.* at 12. As to the second factor, a consideration of the reason for delay, Defendant argues that the delay is attributable not to him, but rather to the Government. *Id.* at 13 ("[N]one of the delay between Indictment (June 11, 2011) and INTERPOL (2017), if not between 2011 and arrest (2019), can be attributed to the defense."). Defendant argues that the Government acted deliberately in its delay by (1) sealing the indictment for over 16 months, (2) spending its resources to lure the Government's primary target, Yip, rather

7

than Defendant, (3) delaying inputting Defendant's information into NCIC, (4) delaying notifying Defendant, even after unsealing the indictment, choosing instead to adopt a lie-in-wait strategy, and (5) waiting at least six years to approach INTERPOL. *Id.* at 13–16. Alternatively, even if the Government was not deliberate, it was at least negligent in its failure to use "reasonable diligence" and "serious efforts" to capture him. *Id.* at 16–17 (citing *Doggett v. United States*, 505 U.S. 647, 656 (1992)). As to the third factor, whether the defendant timely asserted his Speedy Trial rights, Defendant concedes that although he was arrested in June 2019 but did not bring this motion in April 2020, it is the Government's own position that a defendant cannot challenge his indictment from overseas but must await extradition and appearance in court before filing any motion. Docket no. 63 at 18 (citing the "fugitive disentitlement doctrine"). Further, Defendant claims that he only learned the facts supporting this motion at the detention hearing on March 31, 2020. *Id.* Considering the fourth and final factor—whether the delay prejudiced the defendant—Defendant cites the Fifth Circuit for the rule that "where the first three factors taken together weigh heavily in [a] defendant's favor, we may conclude that they warrant a presumption of prejudice." *United States v. Molina-Solorio*, 577 F.3d 300, 307 (5th Cir. 2009). And where such prejudice is presumed, Defendant argues, the Government bears the burden to rebut that presumption persuasively, and it has not done so. Docket no. 63 at 19 (citing *Doggett*, 505 U.S. at 658).

The Government responds that Defendant himself caused the delay, in part, because of his failure to use the same name on his passport as he used to conduct the alleged conspiracy, and that the difference in name caused authorities to fail to identify Defendant's travels to and from the United States and other countries. *See generally* docket no. 65. As to the first *Barker* factor—the length of delay—the Government seeks to exclude three time periods from the calculation:

1.   25 months between indictment on June 15, 2011 and July 14, 2013—the time period in which the Government had only the name Mehrdad Ansari;

2.   13 months between May 16, 2017 and June 16, 2019—the time between the Government's request for the Wanted Person Diffusion and Defendant's capture in Georgia; and

3.   9 months in which Defendant contested his extradition from Georgia. Docket no. 65 at 14.

The Government contends that the Defendant would have been apprehended in October 2012, when Defendant traveled to the United States, if he had not withheld his full name from authorities, including misstating on his visa application that he did not use any other names. *Id.*

As to the second *Barker* factor—the reason for the delay—the Government argues that delays caused by Defendant, rather than the Government, do not constitute speedy trial delay. *Id.* at 16. As in the first factor, the Government contends that the "delay…was intentionally caused by [Defendant's] choice to use a name different than what his passport stated." *Id.* The Government proffers other reasons for its own delay, arguing that it "diligently moved forward" in attempts to capture Defendant "given the constraints of no further identifiers, the inherent difficulty in international extraditions, and the peculiar difficulties to international extraditions" when Iran is involved. *Id.* at 17.

Third, the Government disputes that Defendant timely asserted his speedy trial rights; the Government claims that when the indictment was unsealed on October 24, 2012, a press release was issued that day, and the indictment (and Yip's plea and sentencing) were "widely covered and easily accessible." *Id.* at 26. Further, both versions of his name were placed on the BIS Entities List, and that should have put Defendant on notice. *Id.* at 27. Finally, as to the fourth *Barker* factor, the Government contends that Defendant, rather than the Government, bears the burden of showing

9

prejudice, and Defendant has not done so. *Id.* at 27.

With regard to the first factor – the length of the delay, the Court finds that many periods of time (about four years) were not attributable to the Government.   With regard to the second factor – reason for delay, the Defendant would have been apprehended in October 2012, when he traveled to the United States, if he had not withheld his full name from authorities, including misstating on his visa application that he did not use any other names.   Additionally, the Government proffers good cause for why Defendant's arrest did not come about sooner – the difficulty of extraditing Iranian nationals and the focus on the primary target of the investigation.

With regard to the third factor, the Court finds that the Defendant was not diligent in asserting his Sixth Amendment right.   The Defendant concedes that he was arrested in June 2019 but brought this motion in April 2020.   Despite his assertion that he only became aware of facts supporting this motion at the detention hearing on March 31, 2020, he fails to specify what these facts were.   Clearly, the time frames here were known to him at all times.

With regard to the final factor – prejudice to the defendant resulting from the delay, the Defendant merely argues that the first three factors are so strong in his favor that prejudice can be presumed.   "The court can presume prejudice if the first three factors weigh heavily in the defendant's favor; if they do not, the defendant must show actual prejudice."   *United States v. Rojas*, 812 F.3d 382, 410 (5th Cir. 2016).   The Court finds that, for the reasons stated above, the first three factors do not weigh heavily in the Defendant's favor.   Defendant fails to identify any loss of testimony or evidence.   Further, Defendant fails to show how the absence of any such evidence impairs his defense.   *Id*. at 410.

Defendant's motion (docket no. 63) is DENIED. Defendant's motion for discovery related

to its speedy trial motion (docket no. 64) is DISMISSED AS MOOT because the Government's

provided the requested discovery in its response to Defendant's speedy trial motion.

It is so ORDERED.

SIGNED this 15th day of May, 2020.

_____

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE